This is an interlocutory appeal under Rule 5(a), A.R.App.P., from the trial court's denial of defendants' motions for summary judgment.
The plaintiffs, Roger A. Dearman and Marcia K. Dearman, are the purchasers of a used house. The defendants, William Ray Jones and Joan O. Jones, are the sellers of the residence.
Prior to the purchase, the plaintiffs were shown the Joneses' house by a real estate agent. Thereafter, plaintiffs viewed the house several times and, ultimately, a purchase and sale contract was executed. This contract named Roger A. and Marcia K. Dearman as purchasers. The body of the contract itself identified Ray Jones as sole seller; however, Joan D. Jones executed the contract as seller along with her husband, who signed as William Ray Jones. *Page 708 
Among the printed provisions of this contract were three which concern the present litigation. Paragraph 17 of the contract provides in pertinent part:
 "No oral statement or representation shall have any validity or be considered a part of this agreement of sale."
Paragraph 19 provided:
 "Seller to have septic tank pumped before closing and have house exterminated before possession."
And, Paragraph 24, in part, recited:
 "[S]eller warrants that all heating, cooling, plumbing, electrical, roof, mechanical systems and appliances will be in good working order at time of possession."
The contract of purchase and sale was entered into on September 19, 1983. The plaintiffs took possession of the residence on October 21, 1983. About one month later, sometime during the week of November 20, 1983, some problems developed with the septic tank, i.e., toilets backing up and sinks overflowing. Plaintiffs ultimately filed this lawsuit against the Joneses, alleging three causes of action: breach of contract, breach of an express warranty, and fraud by misrepresentation.
In their breach of contract claim, the plaintiffs alleged:
 "2. Defendants agreed to tender property which was serviced by a plumbing system and which was in good working order at the time Plaintiffs took possession.
 "3. At the time Plaintiffs took possession, which was October 21, 1983, said plumbing system was not in good working order. [Emphasis original.]
 "4. Defendants have breached the contract by failing to deliver to the Plaintiffs property in the promised state of 'good working order.'"
On their breach of express warranty claim, plaintiffs averred:
 "7. Prior to the sale to the Plaintiffs as described above, Defendants, in order to induce the purchase by the Plaintiffs, promised and affirmed, on more than one occasion, that the plumbing system generally, and the sewer system and septic tank, specifically, servicing the above described property, was in good working order. This promise and affirmation was made orally in response to specific inquiry by the Plaintiffs of the Defendants concerning the condition of the plumbing system and reaffirmed in the written agreement attached hereto as Exhibit 'A', and made a part of this Complaint by such attachment.
 "8. The statements and promises were a part of the basis of the bargain between the parties in that the Plaintiffs relied upon the truth of these statements, promises and affirmations in purchasing said property.
 "9. In fact, said plumbing system, generally, and the sewage system and septic tank, specifically, were not in good working order, neither at the time of negotiations sealing the bargain between the Plaintiffs and Defendants, nor at any time thereafter to the present. [Emphasis original.]"
Plaintiffs' fraud count alleged:
 "11. During the month of September, 1983, prior to the 19th day of September, 1983, Defendants and Plaintiffs were negotiating an agreement concerning the property described in Count I, Paragraph 1 of this Complaint, and described further in Exhibit 'A'.
 "12. At that time, the Plaintiffs inquired generally about the plumbing system and specifically about the sewage system and septic tank.
 "13. Defendants replied that the system was in good working order and further, the Defendants had experienced no difficulty with the system.
 "14. On or about the 19th day of September, 1983, the Plaintiffs again inquired about the plumbing system, generally, and the sewage system and septic tank, specifically, and the Defendants rendered the same response; that the septic tank and sewage system were in good working order.
 "15. The representations made by the Defendants that the plumbing system, generally, and the sewage system and *Page 709 
septic tank, specifically, were in good working order, were false misrepresentations of fact made knowingly. Further, Defendants' misrepresentations were made with the intention that the Plaintiffs believe them and act in reliance upon them.
 "16. The Plaintiffs relied on the Defendants' intentional, fraudulent misrepresentation that the plumbing system, generally, and the sewage system and septic tank, specifically, were in good working order."
The defendants answered, and discovery ensued by depositions and interrogatories. The defendants then moved separately for summary judgments, which were denied; hence, this interlocutory appeal.
The parties agree that the principal issues presented deal with (1) the effect of the ultimate deed containing no survivability language upon prior representations, and (2) whether there was any evidence of fraud.
As to the first of these issues, defendants' position is that plaintiffs' knowing acceptance of the deed by the defendants merged all prior negotiations and representations into the deed, and that, barring its procurement by fraud, the deed itself became the measure of the parties' respective rights.
Such a result is mandated by our decisions. InAlger-Sullivan Lumber Co. v. Union Trust Co., 207 Ala. 138,92 So. 254 (1922), this Court stated the controlling doctrine:
 "[O]rdinarily, in the absence of fraud or mistake, when a contract to convey has been consummated by the execution and delivery of the deed, the contract becomes functus officio, and the deed becomes the sole memorial and expositor of the agreement between the parties, and upon it thereafter the rights of the parties rest exclusively. . . ."
207 Ala. at 142, 92 So. at 257.
For applications of this principle, see Russell v.Mullis, 479 So.2d 727 (Ala. 1985); and Roberts v.Peoples Bank Trust Co., 410 So.2d 393 (Ala. 1982). Indeed, the doctrine has been applied in a suit to reform a deed which contained a provision that plaintiff-grantee assumed a mortgage, when plaintiff contended that he never agreed to such an undertaking. This Court stated in McKleroy v.Dishman, 225 Ala. 131, 135, 142 So. 41, 44 (1932):
 "If the deed was accepted with knowledge of its contents in this regard, this would foreclose further inquiry; prior negotiations would be merged in the written contract entered into and knowingly accepted as the final memorial of the transaction. . . ."
In this case, it affirmatively appears that both Roger and Marcia Dearman, plaintiffs, were familiar with the terms of the deed, even if they did not actually read their deed in its entirety. In her deposition, Mrs. Dearman testified:
 "Q. Defendant's Exhibit Number Four is a deed. Do you recognize that deed?
 "A. I just remember a lot of papers. I don't really remember any particular one at the time.
 "Q. All right. Did you read over that deed at the closing?
 "A. Not in its entirety. There were many, many papers that I recall. And several times I remember trying to sit and read, and the lawyers would say, well, don't bother with that. This is what it means. And he would briefly summarize what was on the paper so we could sign. It was a quite hurried affair that night.
 "Q. Did you have legal representation at that time?
"A. No, sir.
 "Q. Did anyone prevent you from having legal representation?
"A. No, sir.
 "Q. Did either of the Joneses in any way force you to accept that deed?
"A. No, sir.
 "Q. Or trick you as to the contents of that deed?
"A. No, sir.
 "Q. And you knew at that time, didn't you, that that deed did not mention anything in it about the prior contract or *Page 710 
about any sewage or plumbing or septic tank?
"A. Right."
Mr. Dearman's testimony is also revealing:
 "Q. All right. I'm showing you Defendant's Exhibit Number Four. And is that the deed that you all signed at the closing?
"A. It looks like a copy of it, yes.
 "Q. All right. Did you read over this instrument before you signed it?
"A. In its entirety, no.
"Q. What parts of it did you read?
 "A. I don't know what parts of it I read over. Like I said, Mr. Reneau went over a lot of it. Said, this says this; that says that. The Joneses were in a hurry. They needed to go someplace else to close on another house, that sort of thing.
"Q. Did your wife read over it?
"A. I don't remember her doing it, no.
 "Q. All right. Did anyone prevent you from reading the deed.
 "A. I felt kind of rushed, yes. I would say that there was an air of the Joneses being hurried and wanting to hurry up and close on this. I felt kind of pressured not to sit there and read the whole thing word for word, yes.
 "Q. But they didn't tell you you could not read it?
"A. No. No one told me I could not.
 "Q. Did anyone prevent you from having legal counsel?
"A. No.
"Q. Did you have legal counsel at that time?
"A. No.
 "Q. All right. Did anyone prevent your wife from having legal counsel?
"A. No.
 "Q. All right. You were aware, weren't you, that the deed did not have any reference in it to any plumbing or sewage?
"A. Normally doesn't, does it?
"Q. I said, were you aware that it did not?
"A. No.
 "MR. MACON: The deed speaks for itself. I object. The deed speaks for itself. It's in evidence.
"Q. Were you aware that it did not?
"A. No.
"Q. You were not aware?
"A. Not really, no.
 "Q. Did any of the Joneses make any representation to you or to your wife as to what was in the deed or what was not in the deed?
"A. No, just their lawyer.
"Q. Mr. Reneau?
"A. Mr. Reneau.
"Q. And what did he tell you in that regard?
 "A. I don't remember. You know, this describes the property, and this is, you know, approximately five acres with a house and a barn and that sort of thing, you know.
 "Q. Did either of them trick you into signing the deed?
"A. I wouldn't say so, no.
"Q. Did they force you to sign it?
"A. No.
". . .
 "Q. Did they ever trick you as to the contents of the deed?
"A. I don't think so, no.
 "Q. Did they ever trick you or force you to agree to accepting that deed?
"A. No."
Under this evidence of the grantees, there was neither mistake nor fraud practiced upon the grantees in the execution and delivery of the deed itself; hence, that deed, whose language contains no expression on the survival of any covenants or warranties respecting the plumbing, contains the "exposition of the agreement between the parties."Alger-Sullivan Lumber Co., supra, 207 Ala. at 142,92 So. at 257. Thus, the effect of the disclaiming language of Paragraph 17 of the contract of sale, together with the absence of any warranties or covenants relative to plumbing in the deed itself, forecloses a finding of any warranties or other contractual obligations upon the sellers of this residence. *Page 711 
Moreover, there is absent any evidence of fraudulent misrepresentation by the Joneses which induced the Dearmans to purchase the residence. Specifically, the record contains no evidence that the Joneses misrepresented the working order of the plumbing system at the time of possession.
Roger Dearman, himself, was unclear on the date of his conversation with the Joneses concerning the septic tank system. In his answers to interrogatories, Dearman stated as follows:
 "Q. All right. And what I have asked you is did you talk to the Joneses or either of them before September the 19th?
". . .
 "A. I keep getting my dates mixed up, and I don't remember if it was before we signed the contract or after we signed the contract. Did talk about the septic tank system; talked about how low the land was behind the house, about the barn, about the house, you know, a lot of things — and the tractor, the sale of the tractor, me buying the tractor from him."
Dearman then conceded that the conversation in question occurred on the 15th or 16th, that is, before the sale was closed. He then testified:
 "Q. Now, you say in your complaint that you relied on certain representations that the Joneses made. Would you tell me each representation that you relied on and who made that representation?
 "A. On the one — if you are talking about the septic tank, I discussed with Ray — and my wife and Joan were in there with us — about the septic tank system, whether they had ever had any problems with it, whether it was working good and whether the tank had ever been pumped. I was told they had never had any problems with the septic tank system and that they had never had it pumped. And he said he would have it pumped because it was in the contract, and I had said I wanted it pumped. And they agreed to do that, and best I know, they had it pumped."
Later, Dearman was deposed upon the basis of his claim of fraud against the Joneses:
 "Q. All right. In your Complaint, you say that the system was not good at the time of possession. Is that a correct statement of what you said or alleged?
 "A. Well, based on the problems we had afterward, to me that would be my assumption, yes.
 "Q. All right. And is it true that you didn't notice any problems from the time of the closing up until the week of Thanksgiving?
 "A. I may not have because, like I said, I was going to school, getting up at five-thirty in the morning and sometimes not getting home till midnight. So I do not remember.
 "Q. Do you know whether your wife noticed any prior to that time?
"A. I don't remember.
 "Q. All right. On what basis do you claim that the system was not good at the time of possession since you did not notice problems until in November?
 "A. The positive drain lines, for one thing. Constant problems we have had with the system since we first had problems you know, to me says there was probably problems with it before I bought the house. My neighbors on either side of me, one whose land is higher than mine, has problems. And the one on the other side of me, Mr. Swink whose land is lower than mine constantly has problems, particularly in the wintertime.
 "Q. Do you know whether the Joneses knew of these problems of your neighbors?
"A. No idea.
 "Q. In other words, they hadn't told you they had had conversations with Ray and Joan?
"A. I haven't asked them.
". . .
 "Q. Now, in your Interrogatory Number Twelve, you state that the system was, quote, improperly placed. What do you mean?
 "A. I believe it was. The way the Health Department described it to me, *Page 712 
too, the way the land slopes and the water runs and just saturates. I did dig a hole last winter out toward the drain lines, and I got down to about maybe a foot, thirteen or fourteen inches, and it just filled up with water. So to me, that was apparently a bad choice of putting field drain lines anyway if it did that every winter, you know.
 "Q. When you say improperly placed, you mean it should have been put on a different part of the lot?
"A. Possibly.
 "Q. All right. And do you know who was responsible for locating it in that particular place, whether it was the Joneses or Mr. Mercer or whoever?
"A. No idea.
 "Q. In your Interrogatory Number Twenty-three, you state that the drain lines were insufficient for the septic tank. Who told you that?
"A. I don't know if anyone told me that.
"Q. How did you reach that conclusion, then?
 "A. Probably more of my opinion than anything else, you know.
 "Q. And have you had any training in plumbing or septic tank systems?
 "A. Only what I had in high school when I took vo-ag, you know.
". . . .
 "Q. All right. Did you ever tell Mr. Jones that a truck had run over the lines or anything of that nature?
 "A. I asked him about that because when we moved in, it looked like people had — someone had driven a truck with dual wheels on the rear to the front of the house out toward the road which is right over the septic tank and over the field drain lines.
"Q. Do you know when this was done?
 "A. No. All I said, it looked like it. It looked like there was tracks from a fairly large truck, something larger than a pickup."
(Emphasis added.)
This evidence, we respectfully observe, does not raise a reasonable inference that the Joneses themselves were responsible for a defective septic tank, or that they knew it was deficient, or indeed, that the system itself was defective at the time the contract was entered into, September 19, 1983, or before, or at the time the sale was closed on October 21, 1983. The record discloses that the Joneses contracted with a builder for the construction of their home, which included construction of the septic tank system. Except for placing a drainage pipe in front of his house to take away surface water, it was not shown that the Joneses did anything to that system. Roger Dearman's testimony itself establishes that the basis for his claim of fraudulent misrepresentation is based upon his own speculation that, because he experienced a problem about one month later, the Joneses' earlier representation that it was in good working order must have been fraudulent. A conclusion based upon speculation or conjecture regarding liability does not satisfy the scintilla rule. Alabama Power Co. v.Smith, 409 So.2d 760 (Ala. 1981).
Thus, we conclude that the trial court erred in denying summary judgment on the contract, warranty, and fraud counts. Accordingly, the order of the trial court must be, and it is, reversed, and this cause is remanded to that court for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
MADDOX, SHORES, HOUSTON and STEAGALL, JJ., concur.
ALMON and ADAMS, JJ., concur in the result. *Page 1136